IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JOHN MADSEN, *et al.*,

                Plaintiffs,

      vs.

RUSSELL LEE JACOBY, *et al.*,

             Defendants.

Case No. 3:21-cv-00123-JMK

**ORDER REGARDING POST-VERDICT MOTIONS**

        Pending before the Court are several post-verdict motions.  At Dockets 107 and 108 the parties filed cross-motions for attorney's fees.  At Docket 111 Defendants filed a renewed motion for judgment as a matter of law, and at Docket 112 they filed a motion requesting a new trial.  The Court first will address Dockets 111 and 112, and then will address the competing motions for attorney's fees.  As set forth below, Defendants' Motions are **DENIED**.  Plaintiffs' Motion for Attorney's Fees is **GRANTED IN PART** and **DENIED IN PART**.

# I.   BACKGROUND

## A.   Pre-October 9, 2020

Stephen Lake Lodge ("the Lodge") is a remote lodge accessible by bush plane which provides access to world class hunting and fishing.[1]  In approximately 2001, John Madsen visited the Lodge as a customer and paid for a guided hunt.[2]  Subsequently, in 2012, Mr. Madsen and his business partner, Geoffrey Rubin, purchased the Lodge.[3]  In 2015, Mr. Madsen bought out Mr. Rubin's interest in the Lodge.[4]  Mr. Madsen operated the lodge as a profitable outfitting business.[5]  As an outfitter, Mr. Madsen would book the hunts, but did not go out into the bush with customers.[6]  Instead, customers would be assisted in their hunts by licensed guides.[7]  Mr. Madsen worked closely with one registered guide, Nick Pierskalla, and a team of licensed guides who worked underneath Mr. Pierskalla.[8]  The guides, including Mr. Pierskalla, were independent contractors.[9]

For business reasons, the Lodge and the outfitting business were separated into different limited liability companies.[10]  Stephan Lake Holdings LLC ("SLH") owned the real property, including the Lodge, and Stephan Lake Adventures LLC ("SLA") was the outfitting business.[11]

---

[1] Docket 126 at 8.
[2] *Id.* at 7.
[3] *Id.* at 9.
[4] *Id.* at 11.
[5] *Id.* at 11–13.
[6] *Id.* at 13–14.
[7] *Id.*
[8] *Id.* at 10–11, 20–21.
[9] *Id.* at 4.
[10] Docket 127 at 14–15.
[11] *Id.*

At some point, Mr. Madsen became interested in selling the Lodge because he wanted to distance himself from the demands of running SLA.[12]  In the spring of 2020, Mr. Madsen and Defendants began negotiations to sell the Lodge.[13]  From the beginning of those negotiations, Mr. Madsen intended to retain an ownership interest in SLH so he could recreate at the Lodge.[14]

Defendants operate an outfitting business in Arizona where they guide hunts.[15]  Defendants' Arizona operation benefits from many repeat customers.[16]  Defendants' Arizona operation also depends heavily on social media.[17]  In contemplating the purchase of SLA/SLH, Defendants intended to follow their Arizona business model and market the Lodge through social media as well as to customers who previously had visited.[18]

After the parties had negotiated the basic terms that ultimately would be finalized, Defendants traveled to Alaska to perform a due diligence trip.[19]  Defendants incurred various expenses, such as air fare, lodging, and hunt permits, while performing their due diligence trip.[20]  The due diligence trip took place from August 21, 2020, through September 2, 2020, overlapping with the moose hunt in Alaska.[21]  The due diligence trip

---

[12] Docket 126 at 13.
[13] Docket 128 at 35.
[14] Docket 127 at 8–9.
[15] Docket 128 at 11–13.
[16] *Id.* at 12–13.
[17] *Id.* at 24–25.
[18] *Id.* at 25–26.
[19] *Id.* at 15–16.
[20] *Id.* at 17.
[21] Docket 126 at 19.

was important, not only for Defendants to see the Lodge, but also to develop a relationship with Mr. Pierskalla.[22]

## B.     October 2020 through December 18, 2020

On October 9, 2020, the parties signed a contract titled "Agreement for Purchase, Sale and Assignment of Membership Interests"[23] (the "Sale Contract"). The Sale Contract provided a purchase price of $1,500,000.00 for the sale of Mr. Madsen's entire interest in SLA, as well as 95 percent of Mr. Madsen's interest in SLH.[24] The Sale Contract structured some of the payments from Defendants to Mr. Madsen based on the underlying debt Mr. Madsen owed to Mr. Rubin which encumbered the real property SLH owned.[25] The Sale Contract required Plaintiffs to provide Defendants with "[e]xisting client list for SLA and SLH for all past clients."[26] The Sale Contract also required SLA retain all marketing materials, including social media accounts for Defendants' benefit.[27]

Mr. Madsen did not keep a running list of clients who visited the Lodge.[28] Instead, Mr. Madsen provided Defendants with hunt records that Mr. Pierskalla had available, dating back to 2019.[29] Mr. Madsen told Defendants they could obtain hunt records prior to 2019 by contacting the Alaska Department of Fish and Game.[30]

---

[22] *Id.* at 21.
[23] Docket 110-1.
[24] *Id.* at 3.
[25] *Id.* at 4.
[26] *Id.* at 6.
[27] *Id.* at 9.
[28] Docket 126 at 22–25.
[29] *Id.*
[30] *Id.* at 26.

Mr. Madsen did not maintain social media accounts for the Lodge and did not have access to the Lodge's Facebook account.[31]

From mid-October through mid-December 2020, Defendants acted as owners of the Lodge.[32] During this time, Defendants did not travel to the Lodge or personally occupy it, but instead arranged for Mr. Patrick Schille to look after it.[33]

In October 2020, Defendants communicated with Mr. Pierskalla regarding available hunts near the Lodge, as well as appropriate wages for guides.[34] Subsequently, on December 7, 2020, Mr. Pierskalla messaged Defendants expressing frustration that Defendants had been looking for another registered guide.[35] Mr. Pierskalla explained that he had been waiting for Defendants to make him an offer for pre-season consulting services and that he would not be providing any more assistance until his employment and compensation details were ironed out.[36]

In early December 2020, Defendants called Mr. Madsen and recorded the conversation, without Mr. Madsen's knowledge.[37] On the recorded phone call, Defendants again asked Mr. Madsen about the client list required by the Sale Contract and expressed disappointment that the list only contained hunt logs.[38] On that same phone call, Defendants also asked about social media, websites, and marketing; Mr. Madsen indicated

---

[31] Docket 127 at 11–12.
[32] Docket 129 at 26–28.
[33] *Id.*
[34] Docket 122-2 at 15.
[35] *Id.* at 20.
[36] *Id.* at 20–21.
[37] Docket 129 at 35.
[38] Docket 128 at 28–31.

he did not have access to any social media or marketing for the Lodge.[39]  On December 14, 2020, Defendants terminated the Sale Contract and indicated they would vacate the Lodge by December 18, 2020, and would not make any future payments.[40]  Defendants asked their agent, Mr. Schille, to take a video to document the condition of the premises before he departed from the Lodge.[41]

## C.    Late December 2020 through Spring 2021

Mr. Stephen Hastings had worked with Mr. Madsen since 2018 and transported clients out to the Lodge.[42]  In December 2020, Mr. Hastings was checking on his own remote cabin, which is in the vicinity of the Lodge.[43]  During this time, he flew over the Lodge and observed an aircraft on the landing strip near the Lodge in the process of loading propane canisters.[44]

Sometime in late December, Mr. Madsen asked Mr. Hastings to check on the Lodge because Defendants "had essentially abandoned it."[45]  Mr. Hastings observed that trash, food, extension cords and generators all had been left out.[46]  Mr. Hastings reported his observations to Mr. Madsen.[47]  Mr. Madsen asked Mr. Hastings to return and clean up the Lodge.[48]  Mr. Hastings returned in a small aircraft and attempted to pack the snow on

---

[39] *Id.* at 31–32.
[40] *Id.* at 33; Docket 129 at 14.
[41] Docket 129 at 13–15.
[42] Docket 128 at 2.
[43] *Id.* at 10.
[44] *Id.*
[45] *Id.* at 3–4.
[46] *Id.* at 4.
[47] *Id.* at 5.
[48] *Id.*

the runway which would allow for a larger aircraft to land.[49] Mr. Hastings was unable to pack the airstrip because the machine used to do so was not functional.[50] Mr. Hastings observed the machine in working condition several months earlier when he helped winterize the Lodge.[51] Mr. Hastings also noticed a four wheeler was left in a state of disrepair at the Lodge.[52] As was the case with the other machine, Mr. Hastings had used the four wheeler in the fall of 2020 and experienced no issues with it at that time.[53]

When Mr. Madsen took back possession of the Lodge from Defendants, many of the consumables had been used and not restocked.[54] This included several 500-gallon gasoline tanks, a 1,000-gallon generator tank, a 300-gallon tank for the water heater, a 250-gallon fuel tank for the boats, and a handful of small gas cans. There also were roughly 25 propane canisters weighing between 40 and 100 pounds that were removed from the Lodge and not returned.[55]

## D.    Legal Proceedings

In February 2021, Plaintiffs filed suit against Defendants in the Superior Court for the State of Alaska.[56] In May 2021, Defendants removed the case to the U.S. District Court for the District of Alaska.[57] On September 28, 2022, Plaintiffs sent an Offer

---

[49] *Id.* at 5–6.
[50] *Id.* at 6–7.
[51] *Id.* at 7.
[52] *Id.* at 8.
[53] *Id.* at 8–9.
[54] Docket 126 at 28–30.
[55] *Id.* at 30.
[56] Docket 1-1.
[57] Docket 1.

of Judgment to Defendants.[58]  The Offer of Judgment would have awarded $125,000.00 to Defendants and resolved the case in its entirety. [59]  Defendants did not accept the Offer of Judgment, and the case proceeded to trial.

At Docket 68, Defendants filed their Final Witness List, which included Mr. Schille.  On the morning of the first day of trial, Defendants requested Mr. Schille be permitted to testify telephonically because "there's a lot of flooding.  And for him to be able to get here, he would have to do a lot of things, including going down a river, hiking nine miles and then maybe getting a bush plane."[60]  Plaintiffs opposed Mr. Schille participating telephonically, and asked the Court to hear from Mr. Schille directly before making a final decision.[61]  Plaintiffs noted that no affidavit to support their assertion was attached to Defendants' Motion at Docket 93.[62]  The Court inquired about the testimony Defendants intended to elicit from Mr. Schille and Defendants answered that Mr. Schille would be testifying about the videos he took of the Lodge at the time possession of the Lodge went from Defendants to Mr. Madsen.[63]  When Mr. Schille called in telephonically, the Court asked why he was unable to testify in person.[64]  Mr. Schille said nothing of adverse flooding conditions, only that the trip would be inconvenient for him, but noted that if one Defendant drove from Anchorage to Talkeetna to pick him up he would be able

---

[58]  Docket 107-1.
[59]  *Id.*
[60]  Docket 125 at 6.
[61]  Docket 126 at 2–3.
[62]  *Id.*
[63]  Docket 127 at 4.
[64]  *Id.* at 5.

to testify in person.[65]  Accordingly, the Court denied Defendants' request for Mr. Schille to testify telephonically.[66]  Mr. Schille was not called as a witness.[67]  Defendant Shawn Morrison authenticated that videos recorded by Mr. Schille were true and accurate representations of the Lodge based on his personal knowledge, and articulated that the videos were taken by Mr. Schille at his request.[68]  Over an objection by Plaintiffs, the Court allowed the videos to be entered into evidence and instructed the jury that the videos were only relevant if the jury found that Mr. Schille recorded the videos in accordance with Mr. Morrison's instructions.[69]  On cross examination, Plaintiffs pointed out that Mr. Morrison did not have personal knowledge of when the videos were recorded.[70]

At Docket 81, the Court directed the parties to file proposed special verdict forms by July 13, 2023.  At Docket 90, Defendants objected to the use of a special verdict form.  The Court commented that "there are a lot of confusing aspects as to this case, both the claims, counterclaims, and affirmative defenses."[71]  On the first day of trial it was not clear to the Court whether Defendants were raising misrepresentation as an affirmative defense, a separate tort claim, or both.[72]  The Court decided to employ a special verdict form to provide the jury with a framework upon which to make its determination.[73]

---

[65] *Id.* at 5–6.
[66] *Id.* at 6.
[67] Docket 101.
[68] Docket 129 at 9–17.
[69] *Id.* at 17–19.
[70] Docket 132 at 4–8.
[71] Docket 125 at 3.
[72] *Id.* at 8–9.
[73] *Id.* at 4.

On the second day of trial, the Court further discussed with the parties the difference between the affirmative defense of misrepresentation and the tort of misrepresentation.[74]  Specifically, Plaintiffs explained that the jury instruction regarding the affirmative defense of misrepresentation should come before the instruction regarding the tort of misrepresentation.[75]  Plaintiffs took this position because, if the jury found that the affirmative defense was applicable, there should be an instruction regarding ratification, because ratification only applies to the affirmative defense and not to stand-alone tort claims.[76]  Defendants argued that the special verdict form should prompt the jury to consider the tort of misrepresentation, even if they found in Defendants' favor for the affirmative defense of misrepresentation.[77]  Defendants explained that application of the affirmative defense would limit Defendants' damages to the value of deposit of the Sale Contract while proving the tort of misrepresentation would permit recovery of earlier costs incurred by Defendants in preparing to enter the Sale Contract, such as costs associated with the due diligence trip.[78]

On the morning of the fifth day of trial, the Court discussed several modifications the parties had requested to the Jury Packet.[79]  After incorporating the requested modifications, the Court explained that the Jury Packet would be finalized later that day and that counsel for both parties would have a chance to review and "put on the

---

[74] Docket 126 at 31–32.
[75] *Id.* at 32.
[76] *Id.*
[77] *Id.* at 33–35.
[78] *Id.* at 34.
[79] Docket 129 at 2–5.

record any objections that they might have to that final packet."[80]  After the parties reviewed the finalized Jury Packet, the Court asked Defendants if they had "any issues with the final jury packet that need to be discussed."[81]  Counsel for Defendants responded they did not have any issues with the finalized Jury Packet, including the special verdict form.[82]

During closing arguments, Defendants asked the jury to fill out the special verdict form by answering "no" to question one and then skipping questions two through five, and answer question six.[83]

On July 25, 2023, the jury reached a verdict.[84]  Before ushering the jury into the courtroom, the Court met with the parties to discuss the procedure for reading the verdict.[85]  Counsel for Defendants, appearing virtually,[86] indicated he had no problem with the normal procedure outlined by the Court.[87]  The jury was ushered into the courtroom, the Court received the unanimous verdict and read it into the record.[88]  The jury found that Defendants did not breach the Sale Contract, but that Defendants did breach the covenant of good faith and fair dealing, and awarded one dollar to Plaintiffs.[89]  The jury further

---

[80] *Id.* at 5.
[81] Docket 132 at 13.
[82] *Id.*
[83] Docket 129 at 43–45.
[84] Docket 100-4; Docket 105.
[85] Docket 131 at 2–3.
[86] Counsel for Defendants requested permission to give closing arguments immediately after the close of evidence.  Plaintiffs agreed to the unorthodox procedure and the Court granted Defendants' request.  Counsel for Defendants gave closing argument on day five of trial, and then left the District of Alaska.  On day six of trial, Plaintiffs gave closing arguments.  *See* Docket 129 at 22–24; Docket 130 at 1–3.
[87] Docket 131 at 3.
[88] *Id.* at 4.
[89] Docket 105 at ¶¶ 1, 6–7.

found that Plaintiffs had not made intentional misrepresentations to Defendants, but that they had made negligent misrepresentations to Defendants, and awarded one dollar to Defendants.[90]  The Court then asked both parties if they wanted the jury polled, to which the parties responded they did not.[91]  Subsequently, the Court asked each party if there was anything that needed to be addressed.[92]  Counsel for Defendants stated, "Not at the moment, Your Honor.  I have a feeling there may be some motions filed at later date on our account."[93]

Both sides filed motions seeking attorney's fees and costs under a provision in the Sale Contract.  Defendants also filed motions seeking judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("FRCP") 50 and a new trial pursuant to FRCP 59.

## II.   LEGAL STANDARD

### A.   FRCP 50

FRCP 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may," grant a motion for judgment as a matter of law ("JMOL").[94]  If a court does not grant the moving party's JMOL, the moving party may renew its motion after trial pursuant to FRCP 50(b).[95]  The

---

[90] *Id.* at ¶¶ 12, 14–15.
[91] Docket 131 at 6.
[92] *Id.*
[93] *Id.*
[94] Fed. R. Civ. P. 50(a).
[95] Fed. R. Civ. P. 50(b).

standard for JMOL "'mirrors' the summary judgment standard,"[96] meaning that "[t]he district court may not weigh evidence or make credibility determinations,"[97] and must "view the evidence in the light most favorable to the nonmoving party [] draw[ing] all reasonable inferences in that party's favor."[98] "A jury's verdict must be upheld if it is supported by evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."[99] JMOL is inappropriate unless the "evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."[100]

## B. FRCP 59

Under FRCP 59, a court may grant a motion for a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."[101] While FRCP 59 does not enumerate the grounds on which a new trial may be granted, courts are "bound by those grounds that have been historically recognized."[102] "Historically recognized grounds include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other

---

[96] *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, (2000)).

[97] *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020) (quoting *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)).

[98] *Id.* (quoting *Go Daddy Software, Inc.*, 581 F.3d at 961).

[99] *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 624 (9th Cir. 2020) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

[100] *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc)).

[101] Fed. R. Civ. P. 59(a)(1)(A).

[102] *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)).

reasons, the trial was not fair to the party moving."[103]  Courts considering a motion for new trial may "weigh the evidence and assess the credibility of witnesses."[104]  If a verdict is "contrary to the clear weight of the evidence," a district court should set aside the verdict and grant a motion for new trial.[105]

## III.   DISCUSSION

### A.    Defendants' Renewed Motion for JMOL

Defendants argue that "[n]o evidence or arguments concerning the breach of implied good faith and fair dealing was ever submitted to the jury" and that, because the jury found in Defendants' favor for their negligent misrepresentation claim, the agreement was void as a matter of law.[106]  Plaintiffs respond that they provided sufficient evidence for the jury to find in their favor concerning breach of the implied covenant of good faith and fair dealing.[107]

The Court construes Defendants' arguments as (1) a sufficiency of the evidence argument and (2) a challenge to the special verdict form provided to the jury.[108]

[103]  *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).
[104]  *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (citing *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987)).
[105]  *Molski*, 481 F.3d at 729.
[106]  Docket 112 at 3–4.
[107]  Docket 117 at 5–6.
[108]  Docket 118 at 4 ("However, given the erroneous special verdict form, the jury was permitted to disregard the law and enter an inappropriate compromise verdict . . . the jury was never specifically asked if Defendants were able to prove whether the Agreement was void.").

### 1.    Implied covenant of good faith and fair dealing

Defendants argue that Plaintiffs provided no evidence or argument regarding Defendants' breach of the implied covenant of good faith and fair dealing.[109]  Plaintiffs argue that because the covenant of good faith and fair dealing is implied in every contract and does not alter the expectations to a contract, evidence regarding contract negotiations, formation, execution, and performance, or lack thereof, all are relevant for establishing a claim for breach of the covenant.[110]  Defendants' assertion is not supported by the record.

Jury instruction number 21 outlines the elements for breach of the implied covenant of good faith and fair dealing stating in relevant part:

> Defendants breached the implied promise of good faith and fair dealing if you find that it is more likely true than not true that:
>
> (1) Defendants intentionally deprived Plaintiffs of a benefit of the Sale Contract; or
>
> (2) Defendants deprived Plaintiffs of a benefit of the Sale Contract by acting in a manner that a reasonable person would regard as unfair.[111]

Drawing all inferences in favor of Plaintiffs, it is clear that Plaintiffs provided sufficient evidence to support the jury's verdict that Defendants breached the implied covenant of good faith and fair dealing.

Plaintiffs provided evidence that Mr. Madsen stood to benefit from the Sale Contract financially and in his personal life.  Mr. Madsen was to receive $1,500,000.00 as

---

[109]  Docket 112 at 3–4.
[110]  Docket 117 at 5.
[111]  Docket 104 at 23.

the purchase price under the Sale Contract.[112]  Defendants' payments to Mr. Madsen were to coincide with payments Mr. Madsen owed on a deed of trust encumbering SLH.[113] Mr. Madsen stood to gain financial flexibility, not only from the overall purchase price, but also the structure of the payments.  Under the Sale Contract, Mr. Madsen retained a five percent ownership interest in SLH.[114]  During trial, Mr. Madsen testified that his five percent ownership interest would enable him to recreate at the Lodge in a personal capacity without paying to stay at the Lodge.[115]  By contrast, the Sale Contract transferred the entire ownership interest in SLA.[116]  Mr. Madsen testified that he was selling the business arm of the Lodge in its entirety because he intended to reduce the demands on his time and attention.[117]  Thus, Mr. Madsen stood to benefit personally by retaining access to an area where he enjoyed recreating, without having the stresses associated with running SLA.[118]

Plaintiffs provided evidence to support a finding that Defendants had acted in a manner that a reasonable person would view as unfair.  Defendants could not run the outfitting operation without Mr. Pierskalla.[119]  However, Mr. Pierskalla felt mistreated by his prospective employers and demanded to sort out his employment details before he would continue working with Defendants.[120]  Plaintiffs pointed out that the relationship

---

[112] Docket 110-1 at 3.

[113] *Id.* at 4.

[114] *Id.* at 3.

[115] Docket 127 at 9 (explaining that Mr. Madsen would pay for consumables, but other than that would not pay for operating costs or be entitled to profits generated by SLA).

[116] Docket 110-1 at 3.

[117] Docket 126 at 13; Docket 127 at 9.

[118] Docket 126 at 8; Docket 127 at 9.

[119] Docket 129 at 32 ("[W]e couldn't ink this deal if Nick didn't s[t]ay on.  Nick was to stay on so that there would be some continuity.").

[120] Docket 122-2 at 20–21; Docket 129 at 29–30.

between Mr. Pierskalla and Defendants soured on or around December 7, 2020,[121] just days before Defendants informed Plaintiffs that they were going to vacate the lodge and cease future payments.[122] Plaintiffs argued that Defendants realized they were in "deep trouble" and decided to walk away from the Sale Contract after they had soured their relationship with Mr. Pierskalla, using the client list and social media access as pretextual excuses.[123]

When control of the Lodge was returned by Defendants, there was significant damage to the vehicles; the premises was covered with trash; roughly 25 propane tanks were missing; and Plaintiffs had used, but not replaced, much of the consumables on site, such as gasoline.[124]

The jury may have believed Plaintiffs' theory, namely that Defendants mishandled their relationship with Mr. Pierskalla, and, when the relationship soured, Defendants decided to renege on their obligations under the Sale Contract.[125] It is also plausible that the jury believed Defendants removed propane tanks, damaged equipment, and left trash on the premises before vacating the lodge.[126] Based on these facts, there was adequate evidence for the jury to find Defendants' actions and motivations to be objectively unfair.

Defendants' assertion that Plaintiffs provided no evidence or argument to support a finding that Defendants breached the implied covenant of good faith and fair

---

[121] Docket 129 at 29–30.
[122] *Id.* at 42–43.
[123] Docket 130 at 3–4.
[124] Docket 128 at 4–11; Docket 126 at 27–30.
[125] Docket 130 at 3–4.
[126] Docket 128 at 4–11; Docket 126 at 27–30.

dealing is incorrect. Because the record contains sufficient evidence to support the jury's finding, the Court cannot grant Defendants' Renewed Motion for JMOL.[127]

## 2. Special verdict form

Defendants argue that flaws in the special verdict form empowered the jury to disregard the law and prevented the jury from determining whether the underlying contract was void.[128] Question one of the special verdict form asks the jury to determine whether Defendants breached the Sale Contract and, if they answer "no," the form directs the jury to skip questions two through five, and answer question six regarding the implied covenant of good faith and fair dealing.[129] After the close of trial and the dismissal of the jury, Defendants now take issue with this procedure because their affirmative defenses contained in questions two, three, and four were skipped by the jury as a result of the jury's answer to question one.[130]

The Court finds that Defendants have waived this argument by failing to raise it before the jury was dismissed. When a "moving party argues that the jury has rendered a verdict that contains two legal conclusions that are inconsistent with one another, and the moving party does not object before jury discharge," the party has waived the argument.[131]

---

[127] *Bridge Aina Le'a, LLC,* 950 F.3d at 624 (quoting *Pavao,* 307 F.3d at 918).
[128] Docket 118 at 4.
[129] Docket 105.
[130] Docket 118 at 4.
[131] *E.g., Kode v. Carlson,* 596 F.3d 608, 611 (9th Cir. 2010); *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1028–29 (9th Cir. 2003) ("The failure to raise this issue prior to the return of the verdict results in a complete waiver, precluding our consideration of the merits of the issue."); *Philippine Nat. Oil Co. v. Garrett Corp.,* 724 F.2d 803, 806 (9th Cir. 1984) ("We hold that PNOC waived its right to object to the verdict by failing to object when the verdict was read."); *Home Indem. Co. v. Lane Powell Moss & Miller,* 43 F.3d 1322, 1331 (9th Cir. 1995) ("We conclude that the district court properly refused to amend the judgment because Home waived its objection to

With input and feedback from the parties, the Court created a jury instruction packet ("Jury Packet") consisting of jury instructions and the special verdict form.[132]  On the morning of the fifth day of trial the Court met with the parties outside the presence of the jury and discussed several requested modifications to the Jury Packet.[133]  After incorporating the modifications, the Court explained that the Jury Packet would be finalized later that day and that counsel for both parties would have a chance to review and "put on the record any objections that they might have to that final packet."[134]  After the parties reviewed the finalized Jury Packet, Defendants specifically indicated they did not have any issues with the finalized Jury Packet, which included the special verdict form.[135]

During closing arguments, Defendants asked the jury to fill out the special verdict form by answering "no" to question one and specifically outlining that the jury would then skip questions two through five, and answer question six.[136]  The jury followed the special verdict form, including the procedure highlighted by Defendants during closing arguments.[137]

On July 25, 2023, the jury reached a verdict.[138]  Before ushering the jury into the courtroom, the Court met with the parties to discuss the procedure for reading the

---

the jury's verdict on its contribution claim by not objecting to the alleged inconsistency prior to the dismissal of the jury.").

[132]  *See generally* Docket 70; Docket 73; Docket 76; Docket 81 (text order); Docket 82; Docket 85; Docket 86; Docket 89; Docket 90; Docket 104; Docket 105; *see also* Docket 125 at 4; Docket 126 at 30–34; Docket 129 at 2–5.

[133]  Docket 129 at 2–5.

[134]  *Id.* at 5.

[135]  Docket 132 at 10, 13.

[136]  Docket 129 at 43–44.

[137]  Docket 105.

[138]  Docket 100-4; Docket 105.

verdict.[139]  Counsel for Defendants, appearing virtually,[140] indicated he had no problem with the normal procedure outlined by the Court.[141]  The jury was ushered into the courtroom, the Court received the unanimous verdict and read it into the record.[142]  The Court then asked both parties if they wanted the jury polled, to which the parties responded they did not.[143]  Subsequently, the Court asked each party if there was anything that needed to be addressed.[144]  Counsel for Defendants stated, "Not at the moment, Your Honor.  I have a feeling there may be some motions filed at later date on our account."[145]  Defendants never objected to the verdict or to the special verdict form contained in the finalized Jury Packet.  By not objecting prior to jury discharge, Defendants waived their argument that the special verdict form prejudiced them, and that the verdict was inconsistent.

Because Plaintiffs provided sufficient evidence to support the jury's finding for breach of the covenant of good faith and fair dealing, and Defendants waived their argument regarding the special verdict form/inconsistent verdict, Defendants' Renewed JMOL is **DENIED**.

---

[139] Docket 131 at 2.

[140] Counsel for Defendants requested permission to give closing arguments immediately after the close of evidence.  Plaintiffs agreed to the unorthodox procedure and the Court granted Defendants' request.  Counsel for Defendants gave closing argument on day five of trial and then left the District of Alaska.  On day six of trial Plaintiffs gave closing arguments.  *See* Docket 129 at 22–24; Docket 130 at 1–3.

[141] Docket 131 at 3.

[142] *Id.* at 4.

[143] *Id.* at 5–6.

[144] *Id.* at 6.

[145] *Id.*

## B. Defendants' Motion for New Trial

Defendants seek a new trial and argue that "(1) the jury's verdict is against the great weight of the evidence; (2) the special verdict form prejudiced Defendants; and (3) the jury's verdict is an improper compromise verdict."[146]  Plaintiffs argue that they did provide evidence concerning breach of the implied covenant of good faith and fair dealing and that the jury verdict is not inherently inconsistent.[147]

### 1. Sufficiency of evidence

Defendants again argue that no evidence was provided to support the jury's verdict that Defendants breached the implied covenant of good faith and fair dealing.[148]  Above, the Court examined this argument under the standard applicable to Defendants' Renewed JMOL.  Here, because Defendants seek a new trial, the Court will weigh the evidence to determine whether the "verdict is contrary to the clear weight of the evidence."[149]

The jury instructions explained that Defendants breached the implied covenant of good faith and fair dealing if "Defendants deprived Plaintiffs of a benefit of the Sale Contract by acting in a manner that a reasonable person would regard as unfair."[150]

Plaintiffs provided evidence of two separate examples of how Defendants acted in a manner that a reasonable person could find unfair.  First, Plaintiffs argued that

---

[146] Docket 111 at 2.
[147] *See generally* Docket 117.
[148] Docket 111 at 4.
[149] *Molski*, 481 F.3d at 729.
[150] Docket 104 at 23.

Defendants walked away from the Sale Contract not because of anything Mr. Madsen did, but instead because Defendants had alienated Mr. Pierskalla and Defendants feared they would be left without a registered guide.[151] This conclusion is supported by the communication between Mr. Pierskalla and Defendants, as well as the short time period between when Mr. Pierskalla demanded fair compensation and Defendants terminated the Sale Contract.[152] Second, Plaintiffs also provided evidence that Defendants left the Lodge in a state of disrepair.[153] This included trash strewn about the property, damage to several vehicles, mud tracked throughout the Lodge, dirty dishes left in the Lodge, and removal of propane and propane accessories from the Lodge.[154]

Defendants argued that they terminated the Sale Contract because Mr. Madsen failed to provide required items under the Sale Contract,[155] and provided a video allegedly depicting the condition of the Lodge when it was turned back over to Plaintiffs.[156]

The jury's finding that Defendants breached the implied covenant of good faith and fair dealing is not contrary to the clear weight of the evidence. Mr. Morrison testified that he felt reservations because Mr. Pierskalla's continued assistance was in question.[157] While Mr. Morrison blamed the situation with Mr. Pierskalla on

---

[151] Docket 130 at 3–4.
[152] Docket 122-2 at 20–21; Docket 129 at 29–30, 42–43.
[153] Docket 128 at 4–11; Docket 126 at 27–30.
[154] Docket 128 at 4–11; Docket 126 at 27–30.
[155] Docket 128 at 19–33.
[156] Docket 129 at 9–17.
[157] *Id.* at 38.

Mr. Madsen,[158] in reviewing the communication between Mr. Pierskalla and Mr. Morrison there is evidence to support the finding that Defendants were responsible for the relationship souring.[159] Based on this evidence, the jury reasonably could have concluded that Defendants were motivated to terminate the Sale Contract because of their own actions. Additionally, Plaintiffs provided testimony from witnesses with firsthand knowledge concerning the state of the Lodge when Defendants re-took possession.[160] The videos provided by Defendants, especially in the absence of Mr. Schille's testimony, do not provide a sufficiently strong evidentiary foundation to overshadow Plaintiffs' testimony.

The Court, after evaluating the evidence provided by both parties, finds that the jury's verdict is reasonable and is not contrary to the clear weight of the evidence.

## 2. Special verdict form and compromise verdict

Defendants allege the jury found that the Sale Contract was void due to misrepresentation and that the special verdict form prejudiced Defendants.[161] This is incorrect; the jury did not find that the Sale Contract was void.[162] The jury followed the special verdict form and the instructions Defendants gave during closing arguments.[163] As discussed above, Defendants waived the opportunity to raise arguments regarding the special verdict form.

---

[158] *Id.* at 30.
[159] Docket 122-2 at 19–21.
[160] Docket 128 at 4–11.
[161] Docket 111 at 5.
[162] Docket 105.
[163] *Id.*

### 3. Compromise verdict

Similarly, Defendants allege that the verdict is a "compromise verdict" and urge the Court to grant a new trial because the damages award was much smaller than Defendants requested.[164]  Specifically, Defendants repeat their incorrect assertion that the jury found the Sale Contract was void due to misrepresentation and therefore, at a minimum, Defendants should have been awarded $82,100.00 for the deposit under the Sale Contract.[165]  Plaintiffs argue that Defendants' theory that the jury's "compromise verdict" warrants a new trial is novel and unsupported by case law from the Ninth Circuit and the District of Alaska.[166]

Again, the jury did not find the Sale Contract was void due to misrepresentation.[167]  Rather, the jury did find Plaintiffs liable for the tort of misrepresentation.[168]  At trial, Defendants insisted that the special verdict form include both the affirmative defense of misrepresentation and the stand-alone tort claims for misrepresentation.  They insisted on this important distinction because application of the affirmative defense would void the Sale Contract and return the deposit, while the tort claims could provide damages from before the Sale Contract, including expenses from the due diligence trip.[169]

---

[164] Docket 111 at 7–8.
[165] *Id.* at 8.
[166] Docket 117 at 10 n.3.
[167] Docket 105 at ¶ 3.
[168] *Id.*
[169] Docket 126 at 34.

Defendants now conflate the tort of misrepresentation with the affirmative defense, stating, "rather than awarding Defendants $82,100 for the deposit, which should have been mandatory per the instructions (as argued by Defendants), Defendants [sic] awarded each party $1."[170] Defendants cite to nothing in the record to support their assertion that awarding $82,100 would be mandatory. In fact, the proposed jury instructions provided by Defendants stated that if the jury were to find in Defendants' favor, the jury must "decide how much money, if any, will fairly compensate [Defendants]."[171] The Jury Packet contained the same language that Defendants provided.[172] Defendants' assertion that the jury was required to award $82,100 if the jury found in their favor is unsubstantiated. Defendants' belief that the tort of negligent misrepresentation voided the Sale Contract is undermined by Defendants' previous position: that application of the affirmative defense would void the Sale Contract, whereas the tort of negligent misrepresentation would result in other relief.[173]

Defendants' remaining arguments concerning a compromise verdict rely on the same arguments posed in the preceding sections. As noted above, the Court has found there to be sufficient evidence to support a finding that Defendants breached the implied

---

[170] Docket 111 at 8 ("The jury found that the Agreement was void based on Madsen's negligent misrepresentation; however, rather than awarding Defendants $82,100 for the deposit, which should have been mandatory per the instructions (as argued by Defendants), Defendants [sic] awarded each party $1.").

[171] Docket 73-1 at 7; Docket 86-1 at 1.

[172] Docket 104 at 32.

[173] Docket 126 at 34.

covenant of good faith and fair dealing, and that Defendants have waived their argument concerning the special verdict form. Defendants' Motion for New Trial is **DENIED**.

## C.    Cross Motions for Attorney's Fees

Both parties claim to be the prevailing party and thus entitled to costs and attorney's fees under the Sale Contract.[174] Plaintiffs additionally argue that they are entitled to attorney's fees and costs under Alaska Rule 68 based on their offer of judgment.[175] Defendants argue that Alaska Rule 68 does not apply because FRCP 68 governs in federal court, and further argue that FRCP 68 does not permit Plaintiffs to make an offer of judgment in their capacity as Counter-Defendants.[176] The Court first will determine the question of prevailing party. The Court then will determine the legal effect of Plaintiffs' offer of judgment.

### 1.    Prevailing party

The Sale Contract contains an attorney's fees provision which applies if either party retains an attorney "to enforce any provision of this Agreement or to protect its interest in any manner arising under this Agreement, or to recover damages for its breach."[177] The provision entitles the prevailing party to "all reasonable costs, damages and expenses, including related actual attorneys' fees, expended or incurred."[178] However, if multiple items are disputed with a final decision against each side, the costs and fees

---

[174] *See generally* Docket 107; *see also* Docket 108.
[175] Docket 107 at 4–6.
[176] Docket 108 at 3–4 (quoting *Home Indem. Co.* 43 F.3d 1322, 1332 (9th Cir. 1995)).
[177] Docket 110-1 at 12.
[178] *Id.*

shall be apportioned according to "the monetary values of the items decided against each party."[179]

District courts follow state rules for awarding attorney's fees when exercising their subject matter jurisdiction over state law claims.[180] Under Alaska law, "[t]he prevailing party to a suit is the one who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of the original contention."[181] "However, there is no 'immutable rule that the party who obtains an affirmative recovery must be considered the prevailing party.'"[182] "Clearly it is within the trial court's discretion to deny attorney's fees altogether," especially where both parties prevail on a main issue and the trial court considers the case to be a "wash."[183]

In this case, each side prevailed on one claim and was awarded a single dollar.[184] The Court can find no better example of a "wash."[185] Neither side is the prevailing party under the Sale Contract. Both sides argue that the clause within the attorney's fees provision apportioning costs based on the value of the respective claims

---

[179] *Id.*

[180] *U.S. ex rel. Rebar Placement Co. v. GBC, L.L.C. Contractors*, No. A03-73 CV JWS, 2005 WL 846211, at *1 (D. Alaska Jan. 18, 2005); *see also* D. Alaska Loc. Civ. R. 54.2; *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 972 (9th Cir. 2013); *Northon v. Rule*, 637 F.3d 937, 938 (9th Cir. 2011) (internal quotations omitted) ("State laws awarding attorneys' fees are generally considered to be substantive laws under the *Erie* doctrine and apply to actions pending in federal district court when the fee award is connected to the substance of the case.").

[181] *Tobeluk v. Lind*, 589 P.2d 873, 876 (Alaska 1979) (quoting *Buza v. Columbia Lumber Co.*, 395 P.2d 511, 514 (Alaska 1964)).

[182] *Id* at 877 (internal quotation marks omitted) (quoting *Owen Jones & Sons, Inc. v. C.R. Lewis Co.*, 497 P.2d 312, 313–14 (Alaska 1972)).

[183] *Id* at 877–89; *see also Schultz v. Wells Fargo Bank, N.A.*, 301 P.3d 1237, 1242 (Alaska 2013).

[184] Docket 105 at ¶¶ 6–7, 14–15.

[185] *Schultz* 301 P.3d at 1242.

does not apply.[186]   Therefore, Defendants Motion for Attorney's Fees is **DENIED**.

Plaintiffs' Motion for Attorney's Fees under the Sale Contract is **DENIED**.

### 2.    Offer of judgment

Plaintiffs assert that they are entitled to attorney's fees pursuant to Alaska Rule 68 because they made an offer of judgment to Defendants, which Defendants rejected.[187]   Defendants argue that Alaska Civil Rule 68 does not apply because FRCP 68 should govern this diversity action.[188]   Defendants also argue that FRCP 68 "applies only to offers of judgment made by a defendant."[189]   Essentially, Defendants argue that Plaintiffs should receive no benefit from their offer of judgment that Defendants rejected.

The Court will determine:  (1) whether FRCP 68 forecloses recovery under Alaska Civil Rule 68; and (2) whether FRCP 68 permits Plaintiffs to make an offer of judgment in these circumstances.

### (a)    FRCP 68 and Alaska Rule 68

Defendants argue that, because this Court sits in diversity, Alaska Rule 68 is inapplicable, and that the issue is moot because the Sale Contract contains an attorney's fees provision.[190]   Plaintiffs argue that the Court should apply Alaska Rule 68 because state laws entitling a party to attorney's fees are substantive rather than procedural.[191]

---

[186] Docket 107 at 3; Docket 108 at 3.
[187] Docket 107 at 4–5.
[188] Docket 108 at 3.
[189] *Id.* at 4 (quoting *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1332 (9th Cir. 1995)).
[190] Docket 110 at 3–4.
[191] Docket 109 at 5–6.

Under FRCP 68, when a party makes an offer of judgment at least 14 days before trial, the offer is denied and the judgment "that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made."[192] The plain language of FRCP 68 only entitles the offeror to costs.[193] In situations where a federal court is applying state substantive law, state law generally will govern an award of attorney' fees.[194] In addressing this issue, the Ninth Circuit explained that "[t]he Supreme Court's construction of [FRCP] 68 in *Marek v. Chesny* . . . governs an award of post-offer attorneys' fees" *Marek* applies to both federal statutes and state statutes granting attorney's fees.[195] *Marek* looked to the underlying statute which permitted recovery of attorney's fees to determine whether those fees were considered "costs for purposes of [FRCP] 68."[196] If the underlying state law considers attorney's fees as costs, then FRCP 68 applies to those fees and forecloses recovery.[197] If, however, the underlying state law considers attorney's fees separate from costs, then FRCP 68 does not apply to those fees and a party may be entitled to fees if they comply with the relevant law which entitles the party to such fees.[198]

Alaska law does not consider attorney's fees as part of costs.[199] When Alaska Rule 68 applies, the offeree must pay "all costs" and a percentage of attorney's fees based

---

[192] Fed. R. Civ. P. 68.
[193] *Id.*
[194] *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1024–25 (9th Cir. 2003) (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000)).
[195] *Id.* at 1026–28.
[196] *Marek v. Chesny*, 473 U.S. 1, 9 (1985).
[197] *Haworth v. State of Nev.*, 56 F.3d 1048, 1051 (9th Cir. 1995).
[198] *Id.*
[199] Alaska R. Civ. P. 68.

on when the offer of judgment was made.[200]  Under *Marek*, FRCP 68 does not apply to the attorney's fees sought by Plaintiffs pursuant to Alaska Rule 68.  Instead, the procedure outlined in FRCP 54 permits a party to seek attorney's fees, provided the moving party timely files and specifies the grounds entitling them to attorney's fees.[201]  In *Cheffins v. Stewart*, the Ninth Circuit permitted Stewart to recover attorney's fees based on a Nevada law entitling a party to recover attorney's fees if an offer of judgment is rejected.[202]  The *Cheffins* court noted that even where the offer of judgment did not satisfy the requirements of FRCP 68, Stewart could recover attorney's fees through FRCP 54 because the offer of judgment satisfied the underlying Nevada state law.[203]  Therefore, the Court will examine whether Plaintiffs complied with Alaska Rule 68 and FRCP 54.

Alaska Rule 68 applies when a party makes an offer of judgment at least ten days before the start of trial and the offer is rejected.[204]  "The offer may not be revoked in the 10 day period following service of the offer."[205]  "If the judgment finally rendered by the court is at least 5 percent less favorable to the offeree than the offer," the offeror is entitled to all costs and a percentage of the offeror's attorney's fees.[206]  On September 28, 2022, Plaintiffs made an offer of judgment to Defendants that would have "resolve[d] all claims between all parties."[207]  The offer of judgment remained open for 14 days and would

---

[200]  Alaska R. Civ. P. 68.
[201]  Fed. R. Civ. P. 54.
[202]  825 F.3d 588, 597 (9th Cir. 2016).
[203]  *Id.*
[204]  Alaska R. Civ. P. 68(a).
[205]  *Id.*
[206]  Alaska R. Civ. P. 68(b).
[207]  Docket 107-1 at 1.

have paid $125,000.00 to Defendants.[208]  Defendants rejected the offer, and on July 17, 2023, the case went to trial.[209]  The jury awarded Defendants one dollar; this award is much less favorable than the offer of judgment made by plaintiffs.[210]  Therefore, Plaintiffs complied with Alaska Rule 68.  Plaintiffs made their offer of judgment more than 90 days before the first day of trial and more than 60 days after initial disclosures were due, entitling them to all costs and 50 percent of Plaintiffs' attorney's fees incurred after the offer of judgment was made.[211]

FRCP 54 requires that a "claim for attorney's fees" be made by motion, filed within 14 days of judgment being entered, specify the "grounds entitling the movant to the award," and provide the amount sought or a fair estimate of the amount sought.[212]  On July 26, 2023, the Court entered judgment.[213]  Nine days later, on August 4, 2023, Plaintiffs filed their Motion for Fees and Costs.[214]  Plaintiffs' Motion for Fees and Costs explained the grounds they believe entitled them to their attorney's fees and costs.[215]  Plaintiffs provided a rough estimate of the amount sought.[216]  Thus, Plaintiffs complied with FRCP 54.[217]

---

[208] *Id.* at 1–2.
[209] Docket 94.
[210] *Compare* Docket 107-1 with Docket 105 at ¶¶ 6–7, 14–15.
[211] Alaska R. Civ. P. 68; *compare* Docket 107-1 with Docket 12 and Docket 94.
[212] Fed. R. Civ. P. 54.
[213] Docket 106.
[214] Docket 107 at 6.
[215] *Id.* at 1–5.
[216] *Id.* at 5.
[217] *See generally* Docket 107.

Because attorney's fees are considered separately from costs under Alaska substantive law, and FRCP 68 only applies to costs, the Court considered Plaintiffs' request for attorney's fees under Alaska Rule 68. Plaintiffs' offer of judgment complied with Alaska Rule 68, and their Motion for Fees and Costs complied with FRCP 54. Plaintiffs are entitled to 50 percent of their attorney's fees pursuant to Alaska Rule 68 from the date the offer of judgment was made.

Defendants' argument that the issue is moot based on the attorney's fees provision in the Sale Contract is unpersuasive. Defendants rely on caselaw concerning attorney's fees provisions and the application of Alaska Rule 82.[218] The caselaw does not discuss whether a provision for attorney's fees has any effect on application of Alaska Rule 68.[219] Alaska Rule 82 states in relevant part: "Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule."[220] Under this language, if the parties agree to a provision for attorney's fees, Alaska Rule 82 is inapplicable. Alaska Rule 68, however, does not limit recovery based on the presence of a provision for attorney's fees.[221] The Court disagrees with Defendants, the attorney's fees provision in the Sale Contract does not prevent application of Alaska Rule 68 in the general sense.[222]

---

[218] Docket 110 at 4.

[219] *Bernie's Pharmacy, Inc. v. AmerisourceBergen Drug Corp.*, No. 3:18-CV-00183-TMB, 2019 WL 5156273 (D. Alaska May 1, 2019).

[220] Alaska R. Civ. P. 82.

[221] Alaska R. Civ. P. 68.

[222] The Court notes that it is unclear the effect an attorney's fees provision may have on Alaska Rule 68(c), which discusses the potential amount of attorney's fees to which a party may be entitled. Under Alaska Rule 68(c), an offeror who satisfies the requirements of Alaska Rule 68(b) is entitled to whichever is greater, the attorney's fees calculated using Alaska

### (b) FRCP 68 and counter-defendants

Defendants argue that FRCP 68 does not permit Plaintiffs to make an offer of judgment in their capacity as counter-defendants.[223]  Plaintiffs argue that the express language of FRCP does not distinguish between Plaintiffs and Defendants, but instead only requires that a party be defending against a claim.

Under FRCP 68, if "a party defending against a claim" makes a valid offer of judgment which is denied, and the "judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made."[224]  FRCP 68 provides an incentive for parties defending against a claim to make reasonable settlement offers early in litigation.[225]  The specific language, "a party defending against a claim," as opposed to just "defendants," indicates that any party who finds themselves defending against a claim may benefit from the incentive scheme provided in FRCP 68.[226]

---

Rule 68(b) or the attorney's fees calculated using Alaska Rule 82.  Where Alaska Rule 82 does not apply, if the parties have agreed to an attorney's fees provision it is unclear whether Alaska Rule 68(c) could entitle Plaintiffs to a greater amount than that specified under Alaska Rule 68(b). Neither party has raised this issue, and Plaintiffs' request for attorney's fees pursuant to Alaska Rule 68 clearly presumes application of Alaska Rule 68(b).  *See* Docket 107 at 4–5 ("Given the timing of when the Rule 68 offer was made, the Plaintiffs would be entitled to 50% of their actual attorney's fees after the date of the offer being made pursuant to ARCP 68(b)(2).").  The Court has found no caselaw on this issue.  Therefore, the Court takes no position on how Alaska Rule 68(c) applies in situations where there is an agreement between the parties concerning attorney's fees, such as the provision in the Sale Contract.

[223] Docket 108 at 4 (quoting *Home Indem. Co.* 43 F.3d 1322, 1332 (9th Cir. 1995)).
[224] Fed. R. Civ. P. 68.
[225] *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1024 (9th Cir. 2003).
[226] Fed. R. Civ. P. 68(a).

In *Simon v. Intercontinental Transp. (ICT) B.V.*, Simon sued the owners of a boat, ICT, for injuries he suffered while working as a stevedore on the boat.[227] Simon's employer, MTC, had been paying workmen's compensation for Simon's injuries.[228] After Simon and ICT began settlement negotiations, MTC formally appeared and requested a lien against Simon's potential recovery against ICT.[229] Simon, the original plaintiff, made an offer of judgment to MTC, which MTC rejected.[230] After judgment issued, the district court concluded that FRCP 68 was satisfied and ordered MTC to pay costs to Simon.[231] In reviewing MTC's appeal, the Ninth Circuit noted that Simon was permitted to make an offer of judgment under FRCP 68 for MTC's claim even though he also was a plaintiff in the action.[232]

Defendants' reliance on *Home Indem. Co. v. Lane Powell Moss & Miller* is misplaced. In *Home Indem. Co.* an insurance company, Home Indemnity Co. ("Home"), sued for legal malpractice against the firm which had represented them in an underlying action; there were no claims against Home.[233] Because Home was a plaintiff and was not defending any claims, FRCP 68 did not permit Home to benefit from its offer of judgment.[234]

---

[227] *Simon v. Intercontinental Transp. (ICT) B.V.*, 882 F.2d 1435, 1437 (9th Cir. 1989).
[228] *Id.*
[229] *Id.*
[230] *Id.* at 1438.
[231] *Id.*
[232] *Id.* at 1439.
[233] *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1325 (9th Cir. 1995).
[234] *Id.* at 1332.

Plaintiffs made their offer of judgement in accordance with FRCP 68. The offer of judgment was made more than 14 days before the start of trial and permitted Defendants to accept it anytime within 14 days from when it was served.[235] Plaintiffs' offer of judgment was for $125,000.00[236] and Defendants received only one dollar for their claims against Plaintiffs at trial.[237] Pursuant to FRCP 68, Plaintiffs are entitled to costs incurred after the offer was made.

Because Plaintiffs complied with the requirements outlined in FRCP 68, they are entitled to costs permitted under the FRCP from the date the offer was made, pursuant to FRCP 68. Based on Plaintiffs' offer of judgment, they also are entitled to 50 percent of their reasonable actual attorney's fees from when the offer was made, pursuant to Alaska Rule 68 and FRCP 54.

Plaintiffs request leave to supplement their Motion for Attorney's Fees with an accounting of attorney's fees incurred in the post-verdict motion practice.[238] FRCP 68 does not include a cutoff date for costs once judgment is entered.[239] Similarly, Alaska Civil Rule 68 does not include a cutoff for attorney's fees once judgment is entered.[240] The Court will permit Plaintiffs to recover any costs and attorney's fees incurred in the post-verdict motion practice. Plaintiffs are directed to file revised accountings of their costs and attorney's fees from the date of their offer of judgment. Because Plaintiffs are entitled to

---

[235] Docket 107-1.
[236] *Id.*
[237] Docket 105 at ¶ 15.
[238] Docket 117 at 11.
[239] Fed. R. Civ. P. 54.
[240] Alaska R. Civ. P. 68.

costs pursuant to FRCP 68, and attorney's fees pursuant to FRCP 54 in connection with Alaska Rule 68, Plaintiffs should provide two separate accountings, one for costs and one for attorney's fees.

## IV.   CONCLUSION

For the reasons stated above:  Defendants Motions at Dockets 108, 111, and 112 are **DENIED**; Plaintiffs Motion at Docket 107 is **GRANTED IN PART** and **DENIED IN PART**.

IT IS SO ORDERED this 3rd day of April, 2024, at Anchorage, Alaska.

*/s/ Joshua M. Kindred*
JOSHUA M. KINDRED
United States District Judge

*Madsen, et al. v. Jacoby, et al.*                                                    Case No. 3:21-cv-00123-JMK
Order Regarding Post-Verdict Motions                                                  Page 36
Case 3:21-cv-00123-JMK   Document 133   Filed 04/03/24   Page 36 of 36